**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| THOMAS C. ZELLER, | |
| Appellant | No. 1135 WDA 2015 |

Appeal from the Judgment of Sentence January 6, 2015
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s): CP-65-CR-0000422-2013

BEFORE: GANTMAN, P.J., SHOGAN, and FITZGERALD,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED APRIL 07, 2016**

Thomas C. Zeller ("Appellant") appeals *nunc pro tunc* from the judgment of sentence entered after he was found guilty of driving under the influence ("DUI"), 75 Pa.C.S. § 3802(a)(1), and a summary motor vehicle offense, 75 Pa.C.S. § 1301. Appellant challenges the denial of his Pa.R.Crim.P. 600 motion to dismiss, as well as the sufficiency and weight of the evidence supporting the DUI conviction. We affirm.

The trial court thoroughly set forth the facts of this case in its opinion denying Appellant's post-sentence motions, which also serves as the trial court's Pa.R.A.P. 1925(a) opinion to this Court. Trial Court Opinion, 6/8/15, at 1–9. In summary, two Scottdale police officers stopped Appellant for an

---

[*] Former Justice specially assigned to the Superior Court.

outdated vehicle registration sticker at approximately 11:51 p.m. on November 5, 2012. N.T., 1/5–6/15, at 67–68, 99–100. Appellant "jumped out" of his van, approached the officers in a "deliberate but aggressive" manner, refused their commands to return to his vehicle, and screamed obscenities at the officers. *Id.* at 69–72, 101–104. After a "lengthy struggle" with Appellant involving a taser and pepper spray, the officers took Appellant into custody. *Id.* at 72–73, 104–110. During the struggle, the officers detected a strong odor of alcohol on Appellant's person. *Id.* at 74, 110. Based on the odor of alcohol, Appellant's belligerent and noncompliant demeanor, and his unintelligible comments, the officers formed the opinion that Appellant "was intoxicated to a degree which rendered him incapable of safe driving." *Id.* Once Appellant was in custody, the officers observed a beverage in a mason jar in the center console cup holder of his van; the beverage looked and smelled like beer. *Id.* at 78, 114. Appellant did not undergo field sobriety tests or consent to chemical testing. *Id.* at 75, 111–112.

Appellant was charged with DUI, aggravated assault, resisting arrest, and a summary motor vehicle offense. He filed a Pa.R.Crim.P. 600 motion to dismiss the charges on October 27, 2014. Following myriad delays, Appellant went to trial on January 5–6, 2015. Before trial commenced, the trial court conducted a hearing on Appellant's Rule 600 motion. After receiving testimony from the Westmoreland County Criminal Courts

Administrator, the trial court denied the motion. N.T., 1/5–6/15, at 26. The jury convicted Appellant of DUI, and the trial court convicted him of the summary motor vehicle offense. *Id.* at 264, 266. Appellant waived a presentence investigation, and the trial court sentenced him to incarceration for a period of not less than seventy-two hours or more than six months. *Id.* at 272–273. Appellant filed post-sentence motions, which the trial court denied. This appeal followed.[1] The trial court and Appellant have complied with Pa.R.A.P. 1925.

Appellant raises the following issues:

I. Did the Trial Court err in denying Appellant's Motion to Dismiss under Rule 600 Pennsylvania Rules of Criminal Procedure, where the prosecution failed to monitor the Rule 600 run date and well over 365 [days] passed from filing the complaint, even when all appropriate periods of delay are excluded?

II. Did the Trial Court err in allowing the jury to deliberate on the DUI charge because the evidence was insufficient as a matter of law to sustain the conviction beyond a reasonable doubt?

---

[1] Appellant filed timely post-sentence motions, but the trial court did not rule on them within 120 days. Pa.R.Crim.P. 720(B)(3)(a). Therefore, the motions should have been denied by operation of law, and the clerk should have entered an order on behalf of the court and served a copy on the defendant. *Id.* at (B)(3)(a), (c). The clerk did not act accordingly. However, counsel filed a petition averring a calendaring error and requesting reinstatement of Appellant's appeal rights *nunc pro tunc*. Petition to Reinstate Appeal Rights, 7/20/15. The Commonwealth did not object, and the trial court granted Appellant's petition. Order, 7/20/15. Appellant filed his notice of appeal two days later. Therefore, we conclude that Appellant's appeal is timely filed and properly before us.

III. Did the Trial Court err in refusing to reverse the conviction at Count 1 and order a new trial because the jury's verdict of guilt[y] on DUI was against the weight of the evidence?

Appellant's Brief at 4.

First, Appellant challenges the trial court's denial of his Rule 600 motion to dismiss. Appellant's Brief at 13. According to Appellant:

The most significant period of delay in the trial of this matter occurred between a call of the list on February 27, 2014 and the filing of [Appellant's] Rule 600 Motion [on] October [27,] 2014. Here, the record reflects that on February 27, 2014 a call of the list was scheduled at which [Appellant] failed to appear. He later presented himself to the Court on March 7, 2014 and the Court vacated the bench warrant and left the case on the trial list for the March trial term. Apparently the Court Administrator's Office did not get notice that the bench warrant was vacated. There was no evidence submitted that the District Attorney failed to receive notice.

Trial Terms were held in May, July and September of 2014. Each trial term was preceded by a "call of the list" in the second half of the preceding month. Neither the Court Administrator, nor the District Attorney's Office listed the case for trial during this period. The Court Administrator's Office acknowledged that the District Attorney can request expedited listing of cases for trial. This was not done in the instant matter.

*Id.* at 14.[2]

_____

[2] In support of his argument, Appellant relies on **Commonwealth v. Sloan**, 67 A.3d 1249 (Pa. Super. 2013), wherein we held that the Commonwealth failed to demonstrate due diligence when it relied on an arraignment clerk to schedule a conference to insure an initial trial date was set within the strictures of Rule 600. **Sloan**, 67 A.3d at 1254. We observed, however, that reliance on the arraignment clerk compounded the Commonwealth's own seven-month delay in filing an information against the defendant. Unlike **Sloan**, the case at hand does not involve any Commonwealth delay. Thus, we consider Appellant's reliance on **Sloan** to be misplaced.

In evaluating Rule 600 issues:

our standard of review of a trial court's decision is whether the trial court abused its discretion. Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.

The proper scope of review ... is limited to the evidence on the record of the Rule 600 evidentiary hearing, and the findings of the trial court. An appellate court must view the facts in the light most favorable to the prevailing party.

Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule 600. Rule 600 serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative mandate of Rule 600 was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule 600 must be construed in a manner consistent with society's right to punish and deter crime. In considering these matters ..., courts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well.

***Commonwealth v. Thompson***, 93 A.3d 478, 486–487 (Pa. Super. 2014)

(citations omitted).

In the case at hand, the trial court concluded that the Commonwealth did not fail to exercise due diligence in bringing Appellant to trial. We agree. In doing so, we observe that the record supports the trial court's ruling. N.T., 1/5–6/15, at 26–29. Furthermore, we adopt as our own the opinion of the trial court. Trial Court Opinion, 6/8/15, at 16–24.

Next, Appellant complains that the Commonwealth's evidence of DUI was insufficient to establish that "his level of alcohol impairment was such as to render him incapable of safe driving." Appellant's Brief at 16. Appellant argues that the police officers did not present any evidence that he was incapable of safe driving. Specifically, Appellant states, "Although the police officers followed his vehicle for several blocks, they did not observe any erratic driving behavior. *Id.*

Our standard of review of a sufficiency claim is well settled:

> We must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt. Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail. The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented. It is not within the province of this Court to re-weigh the evidence and substitute our judgment for that of the fact-finder. The Commonwealth's burden may be met by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that,

- 6 -

> as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Mobley*, 14 A.3d 887, 889–890 (Pa. Super. 2011 (quoting *Commonwealth v. Mollett*, 5 A.3d 291, 313 (Pa. Super. 2010) (internal quotations and citations omitted)).

Appellant was convicted of DUI pursuant to 75 Pa.C.S. section 3802(a)(1), which provides as follows:

**(a)   General impairment.--**

> (1) An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving, operating or being in actual physical control of the movement of the vehicle.

As our Supreme Court has explained:

> [S]ubsection 3802(a)(1) is an 'at the time of driving' offense, requiring that the Commonwealth prove the following elements: the accused was driving, operating, or in actual physical control of the movement of a vehicle during the time when he or she was rendered incapable of safely doing so due to the consumption of alcohol.

*Commonwealth v. Segida*, 985 A.2d 871, 879 (Pa. 2009).  With respect to the type, quantum, and quality of evidence required to prove a general impairment violation, section 3802(a)(1) is a general provision and provides no specific restraint upon the Commonwealth in the manner in which it may prove that an accused operated a vehicle under the influence of alcohol to a degree which rendered him incapable of safe driving.  *Commonwealth v. Teems*, 74 A.3d 142, 145 (Pa. Super. 2013).  The types of evidence that

are relevant in determining whether an individual has violated subsection 3802(a)(1) include the following:

> the offender's **actions and behavior**, including manner of driving and ability to pass field sobriety tests; **demeanor**, including toward the investigating officer; physical appearance, particularly bloodshot eyes and other physical signs of intoxication; **odor of alcohol**, and slurred speech. Blood alcohol level may be added to this list, although it is not necessary.

**Segida**, 985 A.2d at 879 (emphasis supplied). Moreover:

> [t]he weight to be assigned these various types of evidence presents a question for the fact-finder, who may rely on his or her experience, common sense, and/or expert testimony. Regardless of the type of evidence that the Commonwealth proffers to support its case, the focus of subsection 3802(a)(1) remains on the inability of the individual to drive safely due to consumption of alcohol—not on a particular blood alcohol level.

**Id.**; **see also Teems**, 74 A.3d at 145 (quoting **Segida**). To the extent a motorist points to the lack of evidence of any erratic driving on his part, this Court has stated, "Evidence of erratic driving is not a necessary precursor to a finding of guilt under [section 3802(a)(1)]." **Mobley**, 14 A.3d at 890.

Here, the trial court concluded that the Commonwealth presented sufficient evidence to support the DUI conviction: The police officers observed Appellant drive for nine blocks despite the cruiser's flashing lights; when the officers stopped Appellant, he "jumped out" of his van and approached the officers, shouting obscenities, making incoherent remarks, and behaving combatively; the officers smelled alcohol emanating from Appellant's person; Appellant admitted he had come from a bar and had been drinking; and Appellant displayed signs of intoxication familiar to the

police officers. The record supports the trial court's decision. N.T., 1/5–6/15, at 65–124. Therefore, we discern no bases upon which to disturb it. Additionally, we adopt the opinion of the trial court in disposing of this issue. Trial Court Opinion, 6/8/15, at 11–15.

Lastly, Appellant challenges the weight of the evidence supporting his DUI conviction:

> The balance of factors typically relied upon by police in assessing a motorist's level of intoxication all pointed to [Appellant] being perfectly capable of safe driving. He committed no traffic offenses, did not drift about the traffic lanes, did not vary his speed or [do] anything else erratic. There was no testimony of slurred speech, glassy or blood-shot eyes, stagger gait, etc. A conscientious consideration of these matters should shock the Court that the jury would utterly ignore these factors weighing against a conclusion of guilt . . . .

Appellant's Brief at 17–18.

The law pertaining to weight-of-the-evidence claims is well settled. The weight of the evidence is a matter exclusively for the fact finder, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Forbes*, 867 A.2d 1268, 1273–1274 (Pa. Super. 2005). The grant of a new trial is not warranted because of "a mere conflict in the testimony" and must have a stronger foundation than a reassessment of the credibility of witnesses. *Commonwealth v. Bruce*, 916 A.2d 657, 665 (Pa. Super. 2007). Rather, the role of the trial judge is to determine that, notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give

them equal weight with all the facts is to deny justice. ***Id.*** An appellate court's purview:

> is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence.

***Commonwealth v. Knox***, 50 A.3d 732, 738 (Pa. Super. 2012). An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice. ***Forbes***, 867 A.2d at 1273–1274.

In this case, the trial court concluded that the weight of the evidence supported the jury's verdict. We agree, adopting as our own the opinion of the trial court. Trial Court Opinion, 6/8/15, at 15–16.

In sum, we conclude that Appellant's issues warrant no relief and the well-reasoned opinion of the Honorable Rita Donovan Hathaway comprehensively discusses and properly disposes of the questions presented. Accordingly, we affirm on the basis of the trial court's opinion.[3]

Judgment of sentence affirmed.

---

[3] The parties are directed to attach a copy of the trial court's June 8, 2015 opinion to this decision in any future proceedings.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/7/2016

IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY,
PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA )
)
VS. )
) 422 C 2013
THOMAS ZELLER, )
)
Defendant. )

## OPINION AND ORDER OF COURT

The Defendant, Thomas Zeller, ("Zeller"), was charged by amended criminal information at 422 C 2013 on or about January 6, 2015 in the Court of Common Pleas of Westmoreland County, Pennsylvania with one count of Driving Under the Influence of Alcohol or Controlled Substance (75 Pa.C.S. § 3802(a)(1)), two counts of Aggravated Assault (18 Pa.C.S. §2702(a)(3)), two counts of Resisting Arrest (18 Pa.C.S. §5104) and one count of Registration and Certificate of Title Required (75 Pa.C.S. §1301(a)). Zeller was convicted of Driving Under the Influence and the summary offense of Registration and Certificate of Title Required following a jury trial held before this Court on January 5 – 6, 2015. The jury found Zeller not guilty on both counts of Aggravated Assault and both counts of Resisting Arrest. He was sentenced by this Court, at Count 1, to 72 hours to 6 months incarceration, costs and fines and, at Count 6, to a $25 fine. This matter comes before the court on the Defendant's Post-Sentence Motions.

## FACTUAL HISTORY

The charges in this case arose from an incident that occurred on or about November 5, 2012 at approximately 11:51 p.m. in Scottdale, Westmoreland County, Pennsylvania. The evidence presented at trial was, on November 5, 2012, Officer Matthew Zelenak of the Scottdale Police Department was on patrol with his partner, Officer Michael Whipkey, when they got

1

behind a white van at the traffic light at the intersection of West Pittsburgh and Chesnut Streets in Scottdale.[1] (TT 67). The officers observed that the registration sticker on the van's license plate appeared to be expired. (TT 67). Officer Zelenak testified that he confirmed the registration had expired with the dispatcher and activated his overhead lights on the police car. (TT 68). The officers followed the van with its lights activated for approximately six blocks and continued to follow it as the van turned left onto Vine Street and made another right turn onto Market Street, where it ultimately stopped in the 900 block of Market Street. (TT 68). Officer Zelenak testified that the van did not stop from the time the lights were activated until it stopped on Market Street. (TT 68). The officers pulled in behind the van and, as they were radioing their dispatch to notify the dispatcher of the traffic stop, the driver of the van, later identified as Zeller, "jumped out" of the driver's door. (TT 69). Officer Zelenak testified that he gave Zeller a verbal command to get back into his vehicle. (TT 70). Zeller walked toward the officers and Officer Zelenak repeated his command to get back in his vehicle. (TT 71). Zeller replied, "Fuck you," to the officers and kept walking toward the police car. (TT 71). Officer Zelenak testified that Zeller was approaching the officers in "a deliberate, but aggressive" manner. (TT 71). Officer Zelenak testified that he was unsure if Zeller was armed, so he attempted to detain him by grabbing his arm. (TT 71-72). Zeller responded by calling the officers "terrorists," yelling unintelligible remarks and continuing to struggle. (TT 72). Officer Zelenak testified that he advised Zeller that he was going to be tased if he continued to resist, and when he continued, he tased him. (TT 72). After Zeller was tased, he went to the ground and "began yelling and screaming that the terrorists were here, call 911 and he was calling for someone named Phyllis in his house." (TT 72). Officer Zelenak stated that there was a "lengthy" struggle, Zeller was tased

---

[1] Numerals in parenthesis preceded by the letters "TT" refer to specific pages of the transcript of the trial in this matter, held January 5-6, 2015 and made a part of the record herein.

2

multiple times and the taser had no effect on Zeller's demeanor whatsoever. (TT 73). Officer Zelenak testified that Zeller was "kicking, flailing arms and very noncompliant and screaming the entire time" and characterized the encounter as an "all out scrap." (TT 72-73). Ultimately, the officers requested assistance from the Mount Pleasant police department as the struggle ensued. (TT 73). Officer Zelenak testified that, during the struggle, Zeller referred to the officers numerous times as "terrorists," advised them "to enjoy the minute because the world was going to be ending at some point," and made other unintelligible comments. (TT 73). Officer Zelenak testified that he believed that Zeller was intoxicated to a degree which rendered him incapable of safe driving, as "being within inches of his face and talking and screaming I was able to detect a strong odor of an intoxicating beverage upon his person and based on his demeanor and his responses I was able to form an opinion that he was intoxicated." (TT 74). He also testified that Zeller's behavior, in that he was "[n]oncompliant, fighting, loud obnoxious screaming, referring to us as terrorists, screaming for somebody in the house," was an additional indicator that Zeller was intoxicated. (TT 74). Officer Zelenak testified that he was not able to perform any field sobriety tests due to Zeller's combative behavior. (TT 75). After officers from the Mount Pleasant police force arrived, they were able to take Zeller into custody. (TT 76). Once he was in custody in the back of the police car, Officer Zelenak looked into the van and observed a beverage in a mason jar in the cup holder in the center console on the driver's side of the van. (TT 78). Officer Zelenak testified that he smelled the beverage and it appeared to be beer. (TT 78). Officer Zelenak testified that Zeller was then taken to Frick Hospital to be evaluated and for suspicion of Driving Under the Influence. (TT 76). He continued to be noncompliant at the hospital, calling the nurse a "terrorist" and advising her to "enjoy their (sic) terrorist moment." (TT 79).

3

Officer Michael Whipkey also testified regarding the events of November 5, 2012. Officer Whipkey testified that he was in the passenger seat of the police car when Officer Zelenak activated the emergency lights to stop Zeller's vehicle. (TT 100). Officer Whipkey testified that Zeller's van continued to travel on Pittsburgh Street "for six blocks while we had our emergency lights on and then made a left turn onto Vine Street for approximately one block, made a right turn onto Market Street and stopped in the 900 block of Market Street." (TT 100). He testified that Zeller exited his van and walked toward the rear of his van. (TT 102). Officer Whipkey testified that he was concerned because he did not know whether Zeller had a weapon. (TT 102). He stated that the officers "gave him orders to get back into his vehicle and he responded by saying fuck you." (TT 103). Officer Whipkey testified that Zeller was ordered a second time to get back into his vehicle, but Zeller continued to use obscenities and "made a left hand turn toward the rear of his van like he was going to walk toward his residence." (TT 104). He testified that "in addition to saying fuck you," Zeller "began to call us terrorists. He was saying the terrorists were there to get him." (TT 104). Officer Whipkey testified that the officers approached him and attempted to detain him, but Zeller "resisted us" and "started flailing his arms and using obscenities and calling us terrorists." (TT 105). After their initial contact failed to get Zeller under control, Officer Whipkey testified that Zeller was warned that if he did not listen to their commands and put his hands behind his back, he would be tased. (TT 106). Officer Whipkey testified that Zeller's response was to turn toward his house and start walking away from the officers toward his house. (TT 107). As a result, Officer Zelenak deployed his taser, striking Zeller in the back. (TT 106). Officer Whipkey testified that Zeller fell down after being tasered, but continued to struggle with Officer Zelenak, kicking and trying to strike him. (TT 107). Zeller was tased again and Officer Whipkey testified that Zeller still

4

continued to struggle and "stated that he wished to be tasered again." (TT 107). Zeller continued to struggle with the officers and Officer Whipkey testified that Officer Zelenak deployed pepper spray toward Zeller's face. (TT 108). However, Officer Whipkey testified that the pepper spray appeared to have no effect, as Zeller continued to struggle and fight with the officers and "acted like it didn't hurt." (TT 109). Officer Whipkey testified that he suspected Zeller of driving under the influence because "I was able to detect a strong odor of an alcoholic beverage coming from his breath. Also the fact that once we activated the emergency lights the vehicle did not pull over, it continued to drive. And also just his behavior, his mannerisms, the fact that he didn't listen to any commands and the fact that he used obscene language when he came toward us in an aggressive manner led me to believe he was under the influence." (TT 110).

Officer Whipkey testified that, after the Mount Pleasant police officers arrived on the scene, Zeller stopped struggling and the officers were able to take him into custody and transport him to Frick Hospital. (TT 110). Officer Whipkey testified that, after the traffic stop, he also observed an open mason jar in the cupholder in the driver's side of the vehicle that contained a brownish liquid. (TT 114). Officer Whipkey testified that he took it from Officer Zelenak, smelled it and "it smelled like beer to me." (TT 114).

At Frick Hospital, Officer Whipkey testified that Zeller was treated and Whipkey discussed the chemical testing of his blood with him. (TT 111). Officer Whipkey testified that he read the chemical testing warning verbatim from a sheet, explaining the penalties for a refusal, and that Officer Whipkey was requesting a chemical test of blood. (TT 111). Officer Whipkey testified that Zeller responded to the officer, "[E]njoy [your] terrorist moment because the world [is] going to end soon." (TT 111). Whipkey further testified that Zeller never

5

indicated whether he was willing to submit to the chemical testing, but each time Officer Whipkey asked him to submit, Zellers responded by calling him a terrorist. (TT 111). Ultimately, the blood test was never done. (TT 112).

On cross examination, Officer Whipkey testified that he never heard Zeller state that he needed to urinate. (TT 115). Officer Whipkey testified that he did not receive any injuries on November 5, 2012. (TT 119).

In contrast to the Commonwealth's evidence, Zeller testified that, on November 5, 2012, he arrived home at approximately 9:00 p.m. after helping a friend move his daughter's luggage, and, after eating, left to go to the Central Hotel to practice pool. (TT 161). Zeller testified that, after arriving at the Central Hotel, he saw a police car drive slowly past his van. (TT 162). Zeller testified that he left the Central Hotel at approximately 11:45 p.m. (TT 162). He testified that, shortly after pulling out of his parking space, a police car pulled out behind him at a red light. (TT 163). Zeller indicated the police car followed him for the next eight blocks up to Vine Street, but "as [he] made the left-hand turn and went onto Vine Street, they put their lights on and there was no place to just pull right over." (TT 164). Zeller explained that he continued to drive a short distance to his house and parked his car. (TT 165). Zeller testified that as soon as he parked, he "jumped out" of his vehicle because he had to go to the bathroom. (TT 165). He testified that Officer Zelenak "ran up to me and said, get back in that van or you're going to get tased. It sounded like a mad dog to me." (TT 165). Zeller testified that he repeated that he had to urinate and told the officer, "I'm not waiting for a hall pass." (TT 166). Zeller stated that he continued to walk toward the officer and "[a]s far as I'm concerned, necessity takes precedence over the law." (TT 166). Zeller testified that the officer backed up and started letting him go by and, as he went around the left-hand side of the van in the back, Officer Zelenak grabbed Zeller

6

by the arm, but Zeller "shook it off and I said I have to go to the bathroom, man." (TT 166). He also stated that when Officer Zelenak "started to threaten me and after I told him I had to urinate, I told him to fuck off. I meant it, too. I had to go. I told him to back down." (TT 167). Zeller testified that after he shook the officer's arm off and continued to walk, "he took a laser right up to my head and shot me with it. It's a laser weapon that is handheld." (TT 167). He testified that he fell to his hands and knees and he felt frozen in place. (TT 168). Zeller indicated that "[t]his was I know now a remote handheld laser electrical rifle." (TT 168).

Zeller testified that he never swung at either of the officers, never kicked at them and never had any intention to cause bodily harm to the officers. (TT 169). Zeller testified that "I am a committed passivist and I'm not going to resist people. It's not going to happen." (TT 169).

Zeller admitted that he had called the officers terrorists. (TT 170). He indicated that he believed the inspector for Scottdale Borough, George Lender, had threatened him and that this incident was related. (TT 170). He testified that the pepper spray "immediately blinded him." (TT 172). However, after being placed in handcuffs, he testified that two of the officers did a "takedown dance." (TT 172). "They started dancing in the front of my yard and slapping their hands in the air." (TT 172-173).

Zeller testified that he was taken to the hospital and that he was "asked two or three times to do a chemical test and I said no each time." (TT 174). Zeller indicated, "I knew if I took the chemical test they were going to charge me five or six thousand dollars for it. I wasn't going to accept it. It was ---obviously I wasn't DUI. I had no criminal intent that night." (TT 174).

On cross examination, Zeller testified that the officers followed him for nine blocks, but did not turn on their lights until he turned onto Vine Street, but admitted he did not stop until he reached his residence. (TT 177-178). Zeller admitted that he drank two beers while at the

7

Central Hotel. (TT 176). Zeller also indicated that he believed that the incident on November 5, 2012 was related to Mr. Lender's feelings toward him. (TT 179). Zeller also testified that the police did a takedown dance, stating "there was a little song and a little dance." (TT 179). However, Zeller admitted on cross examination that he did not see the takedown dance, but could "hear it." (TT 180). He also acknowledged that he was asked three times to submit to a chemical test and refused the request each time. (TT 181). Zeller also admitted that he told the officers to fuck off and that he was "walking toward the bathroom." (TT 183). Finally, on cross examination, Zeller alleged that he was hit by a "laser gun" that has a "laser beam" that comes out of it and "he lost all the vision in my right eye" as a result. (TT 184).

Phyllis Georgic, Zeller's friend who was residing at his residence on November 5, 2012, also testified on Zeller's behalf. Ms. Georgic testified that she was asleep at the residence when she heard a very long scream and saw red and blue lights. (TT 186). She became alarmed and alighted from the residence to see Zeller laying on the ground. (TT 187). She testified that she asked Officer Whipkey what was going on and he stated, "This could all end quickly. Just tell him to cooperate. Let us handcuff him." (TT 187). Ms. Georgic indicated she saw Zeller being tased and instructed the officers to stop, stating, "I can't imagine how you expect he is going to cooperate if you keep tasing him. Please stop tasing him." (TT 188). She testified that she never saw Zeller swing or kick at the officers. (TT 188). Ms. Georgic testified that when the other officers arrived, all of the activity stopped. (TT 189-190). She also indicated that the white van was, in fact, her vehicle and she did not realize that the registration had expired, because she mistakenly thought the registration and the inspection stickers were the same. (TT 190). Finally, Ms. Georgic indicated that the Defendant had a reputation for being peaceful and nonviolent in the community. (TT 191).

8

Jan Kiefer, Sandra Rodkey and John Gentry testified on Zeller's behalf as character witnesses, as to Zeller's reputation for being peaceful and nonviolent in the community. (TT 139, 152, 157).

Officer Michael Whipkey testified, on rebuttal, that he has never heard of a "laser gun" as described by the Defendant, that chemical testing was not five or six thousand dollars, as indicated by the Defendant, but rather cost about $134.00 and that he had no personal or professional connection to George Lender. (TT 196).

## PROCEDURAL HISTORY

A criminal complaint was filed in this matter on or about November 6, 2012 by Officer Michael Whipkey of the Scottdale Police Department. A review of the record indicates that a preliminary hearing was initially scheduled for November 14, 2012, but was continued by the district court. A preliminary hearing was then scheduled for November 28, 2012, which was continued by the Defendant. The preliminary hearing was held on January 23, 2013. The Defendant was charged by Criminal Information filed at 422 C 2013 on February 15, 2013, which was later amended on or about January 6, 2015. A formal court arraignment was scheduled for March 13, 2013, for which the Defendant failed to appear. A bench warrant letter was issued and filed on or about March 14, 2013. The formal court arraignment was held before the Honorable John E. Blahovec on or about April 17, 2013 and the case was placed on the trial list. On June 25, 2013, a call of the criminal trial list was held before the Honorable Rita Donovan Hathaway and the Defendant again failed to appear. A bench warrant was issued. On June 28, 2013, the bench warrant was vacated by the Honorable Rita Donovan Hathaway and the case was ordered to remain on the trial list. On July 10, 2013, the Defendant requested and was granted a continuance by Order of Court from the July trial term to the next trial term. At the

9

August 27, 2013 criminal call before the Honorable John E. Blahovec, the case was ordered to remain on the trial list. On October 25, 2013, at the call of the criminal trial list before the Honorable John E. Blahovec, the case was ordered to remain on the trial list. On December 19, 2013, at the call of the criminal trial list before the Honorable Alfred B. Bell, the case was ordered to remain on the trial list. On January 13, 2014, the case was continued by the Court from the January, 2014 criminal trial term to the March, 2014 trial term, due to "the unavailability of the court." At the February 27, 2014 call of the criminal trial list, the Defendant failed to appear before the Honorable Rita Donovan Hathaway and a bench warrant was issued. On or about March 7, 2014, the Defendant turned himself in and the bench warrant was vacated by the Honorable Rita Donovan Hathaway. The case was ordered to remain on the trial list. No further activity occurred in this case until October 27, 2014, when the Defendant filed a Motion to Dismiss under Rule 600. A hearing on the Rule 600 Motion was scheduled to be heard on December 18, 2014 by the Honorable Rita Donovan Hathaway, but the Defendant did not appear and the case was ordered to be placed on the January trial term, as the court noted that notice was not sent to anyone. On January 5, 2015, the Rule 600 hearing was held before this Court prior to the commencement of trial. The Rule 600 motion was denied by this Court. Zeller was convicted of Driving under the Influence of Alcohol or Controlled Substance (75 Pa.C.S. § 3802(a)(1))and one count of Registration and Certificate of Title Required (75 Pa.C.S. §1301(a)) following a jury trial held on January 5-6, 2015. The jury found Zeller not guilty of two counts of Aggravated Assault and two counts of Resisting Arrest. He was sentenced by this Court, at Count 1, to the mandatory minimum sentence of 72 hours to 6 months incarceration and costs and fines and at Count 6, to a $25.00 fine. The Defendant failed to report to Adult Probation Office on January 7, 2015 and failed to report to the Westmoreland County Prison on January 12,

10

2015. A bench warrant was issued on January 13, 2015 by the Honorable Rita Donovan Hathaway. On January 16, 2015, the bench warrant was vacated by the Honorable Rita Donovan Hathaway and the Defendant was ordered to be paroled after 72 hours.

The Defendant filed timely post-sentence Motions on January 16, 2015. A hearing on the post-sentence motions was held on or about March 26, 2015. At the hearing, counsel for the Defendant withdrew several bases for relief under the post-sentence motions.[2] (MT 2-7). Counsel for both the Defendant and the Commonwealth sought additional time to submit their briefs, which was granted by the Court by Orders of Court, dated April 15, 2015 and May 7, 2015 respectively. The Defendant's brief was filed on or about April 24, 2015 and the Commonwealth's brief was filed on or about May 12, 2015.

**ISSUES PRESENTED:**

**1. WHETHER THE COMMONWEALTH PRESENTED SUFFICIENT EVIDENCE TO SUPPORT THE VERDICT OF GUILTY FOR DRIVING UNDER THE INFLUENCE?**

In his post-sentence motions, Zeller alleges that the evidence presented by the Commonwealth was insufficient to sustain the jury's verdict of guilty as to the charge of Driving Under the Influence of Alcohol or Controlled Substance (75 Pa.C.S. § 3802(a)(1)).[3]

In reviewing a challenge to the sufficiency of the evidence, a reviewing court:

> must determine whether the evidence admitted at trial, and all reasonable
> inferences drawn therefrom, when viewed in a light most favorable

---

[2] Numerals in parenthesis preceded by the letters "MT" refer to specific pages of the transcript of the post-sentence motions hearing in this matter, held on March 26, 2015, and made a part of the record herein. At the post-sentence motions hearing, counsel for the Defendant asked to voluntarily strike Paragraph 15 from the Defendant's Post-Sentence Motion and Letter D from the Request for Relief, withdrawing the request for a new trial, in the Defendant's Post Sentence Motion, which was granted by this Court. (MT 4).

[3] The Defendant indicates that he "does not challenge the sentence at Count 6, except to the extent that the summary charge should not have been heard at all because of a violation of Rule 600." (Defendant's Memorandum in Support of his Post-Sentence Motion, p. 1-2, ¶2). Further, although the Defendant raised the issue of the mandatory minimum penalty being excessive and/or illegal, the Defendant indicated in his memorandum that the Defendant had served the mandated 72 hour minimum and, as such, the Defendant was no longer seeking to advance this argument, as the issue was now moot. (Defendant's Memorandum in Support of his Post-Sentence Motion, p 5, ¶ 2).

11

to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt. Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail.

The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented. It is not within the province of this Court to re-weigh the evidence and substitute our judgment for that of the fact-finder. The Commonwealth's burden may be met by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Mobley*, 14 A.3d 887, 889-90 (Pa. Super. 2011) (quoting *Commonwealth v. Mollett*, 5 A.3d 291, 313 (Pa. Super 2010).

To prove the crime of Driving Under the Influence of Alcohol or Controlled Substance as charged in Count 1 of the Criminal Information, the Commonwealth was required to prove, beyond a reasonable doubt, that Zeller drove, operated or was in actual physical control of the movement of a motor vehicle after imbibing a sufficient amount of alcohol such that the Defendant was rendered incapable of driving safely.

The Defendant alleges that there was insufficient evidence to support Zeller's conviction for Driving Under the Influence, as the "Commonwealth must establish not only that the accused was drinking and driving on a highway, but that his level of alcohol impairment was such as to render him incapable of safe driving." (Defendant's Memorandum, p. 4, ¶ 2). The Defendant contends that "[n]o field sobriety tests were performed and no testimony was submitted as to Defendant's behavior that would be indicative of his level of intoxication." (Defendant's Memorandum, p. 4, ¶ 2). The Defendant alleges that "the police relied solely on Mr. Zeller's uncooperative attitude to assess his relative sobriety." (Defendant's Memorandum, p. 4, ¶ 2). Further, the Defendant contends that "[t]he other objective evidence of his ability to safely

12

operate a vehicle suggested that he was not impaired," in that the Defendant "negotiated at least two turns, navigated at least one stop light and kept his car wholly within his proper lane of travel." (Defendant's Memorandum, p. 4, ¶ 2). The Defendant concludes that "the Commonwealth relied on mere speculation as to his level of impairment." (Defendant' Memorandum, p. 5, ¶ 1.

It is well settled that a police officer may utilize both his experience and his personal observations to render an opinion on whether an individual is intoxicated. *Commonwealth v. Kelley*, 438 Pa. Super 289, 652 A.2d 378 (Pa. Super 1994). *See also Commonwealth v. Williams*, 941 A.2d 14 (Pa. Super. 2008). "[A] police officer who has perceived a defendant's appearance and acts is competent to express an opinion as to the defendant's state of intoxication and ability to safely drive a vehicle." *Commonwealth v. Palmer*, 751 A.2d 223, 228 (Pa. Super. 2000). Further, intoxication is a matter of common knowledge and opinions given by lay people are permissible on the issue provided that the lay witness has sufficient facts on which to base his opinion regarding another's intoxication. *Commonwealth v. Smith*, 904 A.2d 30, 37 (Pa. Super. 2006), *citing Commonwealth v. Bowser*, 425 Pa. Super. 24, 624 A.2d 125, 133 (Pa. Super 1993).

As outlined in the factual history, the Commonwealth presented sufficient evidence to convict Zeller of Driving Under the Influence. Both Officer Matthew Zelenak and Officer Michael Whipkey observed the Defendant driving the van and testified that the Defendant did not stop for approximately nine (9) blocks after the officers activated the overhead lights on their police car. (TT 68, 100). Both officers testified at length regarding Zeller's combative behavior following the traffic stop, including that he refused to follow their orders to remain in his van after the stop (TT 70-71, 103-104), that he responded to the officers' requests by saying, "Fuck you," (TT 71, 103), that he called them "terrorists" and made other unintelligible remarks, (TT

13

72, 104-105), and that he continued to resist their efforts to take him into custody, even after being tased several times and sprayed with pepper spray (TT 72-73, 107-109). Officer Zelenak testified that he was not able to perform any field sobriety tests due to Zeller's combative behavior. (TT 75). Officer Zelenak further testified that, in his opinion, Zeller was intoxicated to a degree which rendered him incapable of safe driving. "Being within inches of his face and talking to him and screaming I was able to detect a strong odor of an intoxicating beverage upon his person, and based on his demeanor and his responses I was able to form an opinion that he was intoxicated." (TT 74). Officer Whipkey also testified that he believed Zeller was driving under the influence of alcohol.

> Once the initial contact was made and I was close enough to Mr. Zeller, I was unable to detect a strong odor of an alcoholic beverage coming from his breath. Also the fact that once we activated the emergency lights the vehicle did not pull over, it [sic] continued to drive. And also just his behavior, his mannerism, the fact that he didn't listen to any commands and the fact that he used obscene language when he came toward us in an aggressive manner led me to believe that he was under the influence.

(TT 110). Both officers testified that once Zeller was placed into custody, they observed a beverage, described as a "brownish liquid," in a mason jar in the cup holder in the center console on the driver's side of the van and that, after smelling it, they believed it to be beer. (TT 78, 114). Officer Whipkey also testified that he read the chemical test warnings verbatim to the Defendant, explaining the penalties for a refusal and that he was requesting a chemical test of blood from Zeller. (TT 111). Zeller responded by stating, "[E]njoy your terrorist moment because the world [is] going to end soon." (TT 111) and, thus, the Defendant refused a blood alcohol test. Moreover, the Defendant admitted at trial that he consumed alcohol while at the bar (TT 161), that he told the officer to "fuck off," (TT 166), that he did not stop immediately after the officers activated their emergency lights (TT 164 -165), and that he was asked to submit to a blood alcohol test three times and said no each time. (TT 181).

14

"[I]ssues of credibility are left solely to the jury for resolution, and the jury is free to believe all, part or none of the testimony presented." *Commonwealth v. Kerrigan,* 920 A.2d 190, 198 (Pa. Super 2007). Clearly, the jury listened to all of the evidence and evaluated the credibility of the various witnesses and arrived at a verdict they thought proper. The testimony, viewing the evidence in a light most favorable to the Commonwealth as verdict winner, was sufficient to establish the elements of Driving Under the Influence. As the verdict is supported by the sufficiency of the evidence, Zeller is not entitled to have the conviction set aside and a judgment of acquittal entered.

## 2. WHETHER THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE?

Zeller also raises a challenge to the weight of the evidence. "A true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." *Commonwealth v. Galindes,* 786 A.2d 1004, 1013 (Pa. Super 2001). The Pennsylvania Supreme Court in *Commonwealth v. Champney,* 574 Pa. 435, 832 A.2d 403 (Pa. 2003), *cert denied, Champney v. Pennsylvania,* 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed 2d 816, 72 USLW 3768 (2004) set forth the standards in determining whether a verdict is against the weight of the evidence:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice.

*Champney,* 574 Pa. at 444, 832 A.2d at 408 (2003) (internal citations omitted).

The evidence presented by the Commonwealth in this matter has been summarized above. The jury is free to believe all, part or none of the evidence presented at trial. *Commonwealth v. Forbes,* 867 A.2d 1268, 1274 (Pa. Super 2005). Inconsistencies in the

15

testimony of the officers and the Defendant were, therefore, for the jury to resolve. The jury clearly weighed the evidence presented, evaluated the testimony of the witnesses and made a determination thereupon. The evidence was of adequate weight to support the verdict of the jury, and a reviewing court should not disturb the verdict of the jury when the evidence was both of sufficient weight and nature to sustain the verdicts of guilty. For this reason, Zeller is not entitled to a new trial.

## 3. WHETHER THIS CASE SHOULD HAVE BEEN DISMISSED PURSUANT TO RULE 600?

The Defendant's final allegation of error suggests that this Court's pre-trial denial of the Defendant's Rule 600 motion was improper. The Defendant has alleged that the Commonwealth violated his right to a speedy trial under Rule 600 by failing to bring him to trial within 365 days. Rule 600 sets forth the requirements for a timely and prompt trial and provides, in pertinent part:

Rule 600. Prompt Trial
    A) Commencement of Trial; Time for Trial
        (1) For the purpose of this rule, trial shall be deemed to commence on the date the trial judge calls the case to trial, or the defendant tenders a plea of guilty or *nolo contendere.*
        (2) Trial shall commence within the following time periods.
            (a) Trial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed.

    (C) Computation of Time
        (1) For purposes of paragraph (A), periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence. Any other periods of delay shall be excluded from the computation.

    (D) Remedies
        (1) When a defendant has not been brought to trial within the time periods set forth in paragraph (A), at any time before trial, the defendant's attorney, or the

16

defendant if unrepresented, may file a written motion requesting that the charges be dismissed with prejudice on the ground that this rule has been violated. A copy of the motion shall be served on the attorney for the Commonwealth concurrently with filing. The judge shall conduct a hearing on the motion.

Pa. R. Crim.P. 600. Rule 600 thus provides that a defendant on bail is entitled to have trial commence no later than 365 days after the complaint date. *Commonwealth v. Riley*, 19 A.3d 1146, 1148-1149 (Pa. Super 2011); Pa. R.Crim.P.600(A)(3). Rule 600 has the dual purpose of both protecting a defendant's constitutional speedy trial rights and protecting society's right to effective prosecution of criminal cases. *Commonwealth v. Bradford*, 616 Pa. 122, 46 A.3d 693 (Pa. 2012).

> When computing the number of pretrial days attributable to the Commonwealth under this rule, certain delays are excluded, such as those occasioned by defense postponements, by express defense waivers of Rule 600, by the unavailability of the defendant or defense counsel, and/or by the fact that the defendant could not be located and apprehended. *Pa.R.Crim.P. 600(C)*. At any time before trial, a defendant may move for dismissal of the case if Rule 600 has been violated. *Pa.R.Crim.P. 600(G)*. However, even when the defendant has not been tried within the aforesaid 365 days, and even when those days appear to be attributable to the Commonwealth, a Rule 600 motion shall nevertheless be denied if the Commonwealth proves that it acted with due diligence in attempting to try the defendant timely and that the circumstances occasioning the delay were beyond the Commonwealth's control.
> *Commonwealth v. Frye*, 909 A.2d 853, 858 (Pa.Super.2006); Pa.R.Crim.P. 600(G). Thus, if the Commonwealth establishes it acted with due diligence and shows the delay in question was beyond the Commonwealth's control, the delay is excusable.
> *Frye, 909 A.2d at 858*. Due diligence is a fact-specific concept to be determined on a case-by-case basis.
> *Commonwealth v. Ramos*, 936 A.2d 1097, 1102 (Pa.Super.2007). While due diligence does not demand perfection, it does require the Commonwealth to put forth a reasonable effort. *Id.*

17

*Riley* at 1148-1149.

Stated another way, the inquiry for a judge in determining whether there is a violation of the time periods in paragraph (A) is whether the delay is caused solely by the Commonwealth when the Commonwealth has failed to exercise due diligence. *See, e.g., Commonwealth v. Dixon*, 589 Pa. 28, 907 A.2d 468 (2006); *Commonwealth v. Matis*, 551 Pa. 220, 710 A.2d 12 (Pa. 1998). In determining whether the Commonwealth has exercised due diligence, the courts have explained that "[d]ue diligence is fact-specific, to be determined case-by-case; it does not require perfect vigilance and punctilious care, but merely a showing the Commonwealth has put forth a reasonable effort." *See, e.g., Commonwealth v. Selenski*, 606 Pa 51, 61, 994 A.2d 1083, 1089 (Pa. 2010) (citing *Commonwealth v. Hill* and *Commonwealth v. Cornell*, 558 Pa. 238, 256, 736 A.2d 578, 588 (1999)). Thus, if the Commonwealth establishes it acted with due diligence and shows the delay in question was beyond the Commonwealth's control, the delay is excusable. Nevertheless, it is well settled that the administrative mandate of Rule 600 was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth. *Commonwealth v. Hunt*, 858 A.2d 1234, 1239 (Pa. Super 2004).

> So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule [600] must be construed in a manner consistent with society's right to punish and deter crime. In considering [these] matters...,courts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well. Strained and illogical judicial construction adds nothing to our search for justice, but only serves to expand the already bloated arsenal of the unscrupulous criminal determined to manipulate the system.

*Id. citing Commonwealth v. Corbin*, 390 Pa.Super. 243, 568 A.2d 635, 638–39 (Pa. Super. 1990).

18

In the instant case , the Defendant was charged with Driving Under the Influence of Alcohol and other offenses on November 6, 2012. The case was brought to trial on or about January 5-6, 2015, approximately 790 days after the filing of the criminal complaint. Subtracting all of the excludable time, as set forth in the procedural history, the case was brought to trial on or about 546 days after the criminal complaint was filed.[4] As the case was reached clearly beyond the 365 day threshold set forth in Rule 600, the court's inquiry then was to examine the facts of the case and determine whether the delay was excusable. "Excusable delay" is not defined in Rule 600. *Pa. R.Crim.P. 600.* However, as set forth above, if the Commonwealth can establish it acted with due diligence and can show the delay in question was beyond the Commonwealth's control, the delay is excusable. *Frye, supra.*

A Rule 600 hearing was held before this Court on or about January 5, 2015, prior to the commencement of the trial. Pamela Neiderhiser, the deputy court administrator for the Westmoreland County Criminal Courts, was the sole witness to give testimony at the Rule 600 hearing. Ms. Neiderhiser gave testimony regarding the scheduling of criminal cases in the Westmoreland County courts and the scheduling of the Defendant's case in particular.

Ms. Neiderhiser testified that, as deputy court administrator, her office "handles all the cases as they come through the system. After they're assigned a case number we do all the scheduling with the different judges as well as coordinating with the prospective office." (TT 5). Ms. Neiderheiser testified that the Westmoreland County Court Administrator's Office schedules all of the cases in Westmoreland County for trial. (TT 6).

---

[4] The excludable time was calculated as follows: the 56 day continuance requested by the Defendant at the preliminary hearing on 11/28/12; the 14 days that the Defendant did not appear at the formal court arraignment on 4/17/13 until he responded to the bench warrant letter; the 3 day period after the Defendant failed to appear at the call of the list on 6/25/13 and a bench warrant was issued; the 48 days continuance requested by the Defendant at the July trial term; the 45 days that the case was continued to the March trial term by the court because there was no courtroom available; the 8 day period where the Defendant failed to appear at the call of the list on 2/27/14 until the bench warrant was vacated on 3/7/14 and the 70 day period from the time the Defendant filed pre-trial motions until the date that they were heard.

19

Ms. Neiderhiser further testified that, in the Defendant's case, the charges were filed on November 6, 2012 and the arraignment was initially scheduled for March 13, 2013, but the Defendant failed to appear and a bench warrant letter was issued. (TT 6). Ms. Neiderhiser indicated Zeller responded to the bench warrant letter and the arraignment was rescheduled for April 17, 2013, for which the Defendant did appear. (TT 6). Ms. Neiderhiser testified that, on June 25, 2013, the Defendant was scheduled for a criminal call, but he failed to appear and a bench warrant was issued. (TT 7). Ms. Neiderhiser indicated that the bench warrant was vacated on June 28, 2013 and the case was ordered to remain on the trial list. (TT 7). The case was subsequently called for trial on July 10, 2013, according to Ms. Neiderhiser's testimony, but the Defendant continued it to the September trial term. (TT 7). Ms. Neiderhiser testified that the case was not reached in the September, 2013 trial term because there was no courtroom available for the case to be heard, and was placed on the November, 2013 trial list. (TT 8). However, the case was again not reached in November, 2013 because there was no courtroom available. (TT 8). The case was ordered to remain on the trial list at the January trial term, but was not reached because there was no courtroom available. (TT 8). Ms. Neiderhiser testified that the case was next scheduled for a criminal call on February 27, 2014 in anticipation of the March trial list, but the Defendant did not appear and a bench warrant was issued on that date. (TT 8). Significantly, Ms. Neiderhiser testified that, although the bench warrant was, in fact, later vacated, the Court Administrator's Office did not receive notice of that and she believed the bench warrant was outstanding until a Rule 600 motion was filed in November, 2014.[5] (TT 9). Ms. Neiderhiser testified that "we got a notice that the bench warrant was issued, and each case that comes through the system is given a card for our office to keep track of. Our card notes that the bench warrant was issued on February 27th. At that point the card was placed in, we have a bench

---

[5] The Commonwealth stipulated that the Rule 600 motion was actually filed on or about October 27, 2014. (TT 13).

20

warrant file and the card remained there until we are notified that the bench warrant has been vacated or scheduled for a hearing the defendant is picked up on." (TT 11-12). Ms. Neiderhiser indicated that the Westmoreland County Clerk of Court's Office is to provide a copy of the order of court, vacating the bench warrant, to the Court Administrator's Office. (TT 12). When questioned by this Court, inquiring, "The Commonwealth doesn't have any obligation or they don't really do anything pertaining to the bench warrant as far as having to give notice to anybody, correct?" Ms. Neiderhiser testified, "Correct." (TT 12).

Ms. Neiderhiser also testified that some cases are specially set, such as homicides, but most cases on the trial list are called for trial based on the chronological date that the charges are filed. (TT 10). When asked whether the case is put at the top of the trial list when the District Attorney's Office asks for a case to be brought to trial, Ms. Neiderhiser testified, "I don't automatically schedule it first on the list. What I do is I check to see what the complaint date is and make sure that it's placed on the list, but then it will get a call date and from there it goes in with all the other cases that are on the trial list." (TT 18). She further indicated that no continuances were requested by the Commonwealth in this matter. (TT 10).

Ms. Neiderhiser also testified that Westmoreland County typically has four judges hearing criminal cases, but, for most of 2013, there were only three judges hearing criminal cases, as one of the judges was having medical issues, and at times, only two, as another judge retired during 2013. (TT 11).

Ms. Neiderhiser also indicated that motions are not specially set and when a motion is filed, it is scheduled for the next available motions court. (TT 22) Thus, the motion scheduled by the Defendant on October 27, 2014 was scheduled for the first available criminal motions court, which was December, 2014. (TT 22).

21

This Court considered the testimony of Ms. Neiderhiser and the argument advanced by the Defendant. This Court also noted that on March 7, 2014, the day the bench warrant was vacated, neither Mr. Gongaware nor Mr. Manderino were present. (TT 27). The Court denied the Defendant's pre-trial Rule 600 motion, concluding that there was no lack of diligence on the part of the Commonwealth. (TT 28)

It is well settled that:

> When reviewing a trial court's decision in a Rule 600 case,
> an appellate court will reverse only if the trial court abused
> its discretion. *See Commonwealth v. Selenski,* 606 Pa. 51,
> 994 A.2d 1083, 1087 (2010). "An abuse of discretion is not
> merely an error of judgment, but if in reaching a conclusion
> the law is overridden or misapplied, or the judgment exercised
> is manifestly unreasonable, or the result of partiality, prejudice,
> bias or ill-will ... discretion is abused." *Id.* (internal citation
> omitted). Our scope of review is limited to the record evidence
> from the Rule 600 hearing and the findings of the lower court,
> viewed in the light most favorable to the prevailing party. *See Id.*

*Commonwealth v. Bradford,* 616 Pa. 122, 134, 46 A.3d 693, 700 (Pa. 2012).

In his Memorandum in Support of Defendant's Post-Sentence Motion, the Defendant argues that District Attorney's Office did not demonstrate due diligence, in that it cannot rely on the failure of the Court Administrator to list the case for trial, but has its own obligation to track cases and run dates. (Defendant's Memorandum, p. 4, ¶ 1).

In its Response to Defendant's Post Verdict Motion, the Commonwealth argues that the Commonwealth showed due diligence in getting the cases into a courtroom at the earliest possible time, as most of the delay occurred as a result of the Defendant's failure to appear at his court dates and his requests for continuances. (Commonwealth's Response to Defendant's Post Verdict Motions, p. 5, ¶ 2). The Commonwealth also argues that any errors by the Court Administrator or lack of communication between that office and the Clerk of Courts were

22

beyond the control of the Commonwealth. (Commonwealth's Response to Defendant's Post Verdict Motions, p. 5, ¶ 2).

In addressing the issues of whether or not the Commonwealth has exercised due diligence and the circumstances were beyond the control of the Commonwealth, the Pennsylvania Supreme Court stated in *Commonwealth v. Bradford*, 616 Pa. 122, 46 A.3d 693 (Pa. 2012):

> The Commonwealth, however, has the burden of demonstrating
> by a preponderance of the evidence that it exercised due diligence.
> *See Browne*, 584 A.2d at 908. As has been oft stated, "[d]ue diligence
> is fact-specific, to be determined case-by-case; it does not require
> perfect vigilance and punctilious care, but merely a showing the
> Commonwealth has put forth a reasonable effort."
> *Selenski*,994 A.2d at 1089. "If, at any time, it is determined that
> the Commonwealth did not exercise due diligence, the court
> shall dismiss the charges and discharge the defendant."
> Pa.R.Crim.P. 600(G).

*Id.* at 136, 701-702.

The Court also stated:

> So long as there has been no misconduct on the part of the
> Commonwealth in an effort to evade the fundamental speedy
> trial rights of an accused, Rule 1100 must be construed in a
> manner consistent with society's right to punish and deter crime.
> In considering matters such as that now before us, courts must
> carefully factor into the ultimate equation not only the prerogatives
> of the individual accused, but the collective right of the community
> to vigorous law enforcement as well.[6]

*Id.* at 137-138, 702-703.

In this case, there is no evidence that the Commonwealth attempted in any way to evade the Defendant's right to a speedy trial. Nor is there any evidence of prejudice to the Defendant. The time between March, 2014, when the bench warrant was vacated, to October 27, 2014, when the Rule 600 motion was filed was caused by a clerical error in the Court Administrator's Office

---

[6] Rule 1100 is the predecessor to Rule 600.

23

that was outside the control of the Commonwealth. All other delays were attributable to the Defendant or the unavailability of the court. The evidence does not establish that the Commonwealth has failed to exercise due diligence in bringing this case to trial.

## CONCLUSION:

For the foregoing reasons, the Defendant's Post-Sentence Motions are **DENIED**.

24